UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| MARY ANN KNOX, ) | |
| ) | Civ. No: 5:15-CV-00039-GFVT |
| Plaintiff, ) | |
| ) | **MEMORANDUM** |
| V. ) | **OPINION** |
| ) | **&** |
| CAROLYN W. COLVIN, Acting ) | **ORDER** |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

The Plaintiff, Mary Ann Knox, brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of an administrative decision of the Commissioner of Social Security (Commissioner) denying Knox's application for Disability Insurance benefits (DIB) and Supplemental Security Income benefits (SSI). The Court, having reviewed the record and for the reasons set forth herein, DENIES Knox's Motion for Summary Judgment [R. 9] and GRANTS that of the Commissioner. [R. 10.]

**I**

Mary Ann Knox initially filed a claim for a period of disability and disability insurance benefits in November 2011, which was denied both originally and upon reconsideration. [Transcript (Tr.) 111.] After conducting a hearing, Administrative Law Judge (ALJ) Greg Holsclaw held on December 16, 2013, that Ms. Knox was "not disabled" because she could perform a range of light work, as well as her past work, and that she could perform jobs that exist in significant numbers in the national economy. [Tr. 111-119.]

Several months later, Knox reapplied for DIB, as well as for SSI benefits, in May 2014. [Tr. 262, 271.] This time she alleges a disability beginning on October 4, 2013, the same day she was laid off from her previous job at a food processing factory. [Tr. 44, 303-304.] Knox alleges a variety of impairments including degenerative disc disease, chronic neck and back pain, cervical and thoracic degeneration, post-traumatic stress syndrome (PTSD), and depression. [Tr. 302-23.] Her claims were denied initially in July, 2014, and upon reconsideration on August 26, 2014. [R. 186, 193, 200.] At Knox's request, a hearing was held on November 12, 2014, in Lexington, Kentucky, where Ms. Knox testified in person. [Tr. 61-102.]

During the hearing, ALJ Don C. Paris heard testimony from Ms. Knox and also from Ralph M. Crystal, Ph.D., an impartial vocational expert (VE). [*Id*.] Knox, who was fifty-one years old as of the alleged onset date, has completed her GED and attended some college. [Tr. 52, 66, 304, 521.] Her past relevant work includes working in food processing, production, assembly, and dry cleaning, as well as working as an inspector and office manager. [Tr. 51, 96, 325.] Although the VE testified that Knox could no longer perform her past relevant work, he also testified that there are several jobs existing in significant numbers in both the regional and national economies that Knox could perform despite her limitations. [Tr. 50-51, 96-99.] Following the hearing, ALJ Paris issued a decision denying Knox's applications for SSI and DIB on November 20, 2014. [Tr. 44-53.]

In evaluating a claim of disability, an ALJ conducts a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920.[1] First, if a claimant is performing a substantial gainful activity, she is not

---

[1] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520. Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is

2

disabled. 20 C.F.R §§ 404.1520(b); 416.920(a)(4)(i). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not "disabled" as defined by the regulations. 20 C.F.R. §§ 404.1520(c), 416.920(a)(4)(ii). Third, if a claimant's impairments meet or equal one of the impairments listed in Part 404, Subpart P, Appendix 1, she is "disabled." 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii). Before moving to the fourth step, the ALJ must use all relevant evidence in the record to determine the claimant's residual functional capacity (RFC), which is an assessment of one's ability to perform certain physical and mental work activities on a sustained basis despite any impairment experienced by the individual. 20 C.F.R. §§ 404.1520(e), 404.1545. Fourth, the ALJ must determine whether the clamant has the RFC to perform the requirements of her past relevant work, and if a claimant's impairments do not prevent her from doing past relevant work, she is not "disabled." 20 C.F.R. §§ 404.1520(e), 416.920(a)(4)(iv). Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is "disabled" under the regulations. §§ 404.1520(f), 416.920(a)(4)(v).

In this case, at Step 1, ALJ Paris found that Knox has not engaged in substantial gainful activity since her alleged onset date of October 4, 2013. [Tr. 46.] At Step 2, the ALJ found that Knox suffers from the following severe impairments: degenerative disc disease, chronic obstructive pulmonary disease, ischemic heart disease, hypertension, affective disorder and anxiety. [Tr. 47.] At Step 3, the ALJ found that Knox's impairments, whether considered alone

---

precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (internal citations omitted).

or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 47-48.] Before moving to Step 4, ALJ Paris considered the entire record and determined that Knox possessed the residual functional capacity to perform light work as defined in §§ 404.1564(b) and 416.967(b) with certain physical and mental limitations which were described as follows:

> … no lifting/carrying more than 15 pounds occasionally and 10 pounds frequently; no standing/walking more than 6 hours in an 8-hour workday, for no more than 20 minutes at a time; no sitting more than 6 hours in an 8-hour workday, for no more than 30 minutes at one time; limited pushing/pulling with the upper extremities; no reaching overhead with the non-dominant upper extremity; no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing ramps/stairs; no climbing ladders or ropes; no more than extreme heat, coldness or humidity; no work in areas of concentrated dusts, fumes, odors, or concentrated vibration; no work around dangerous machinery or heights; performance of simple, routine work with 1-2-3-step instructions; no more than occasional interaction with coworkers, supervisors, or the public; and no more than occasional changes in the work setting.

[Tr. 48-49.] After explaining how he determined Knox's RFC [Tr. 47-51], the ALJ found at Step 4 that based on this RFC, Knox is unable to perform any of her past relevant work. [Tr. 51-52.]

At Step 5, the burden shifted to the Commissioner to identify a significant number of jobs in the national economy that Knox could perform, given her RFC, age, education, and experience. *Jones*, 336 F.3d at 474; 20 C.F.R. §§ 404.1520(g), 404.1560(c). Here, ALJ Paris concluded that, based on these factors, and also based on the VE's testimony, there are jobs that exist in significant numbers within both the national and regional economies that Knox could perform. [Tr. 52-53.] Accordingly, on November 20, 2014, ALJ Paris issued an unfavorable decision, finding that Knox was not "disabled," and therefore ineligible for DIB and SSI. [Tr. 53.] The Appeals Council declined to review the ALJ's decision on January 12, 2015 [Tr. 12-17], and Knox now seeks judicial review in this Court.

**II**

This Court's review is limited to whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r Soc. Sec..*, 402 F.3d 591, 595 (6th Cir. 2005) (citation and quotation marks omitted). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Longworth*, 402 F.3d at 595. The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (citations and quotation marks omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole. *Cutlip*, 25 F.3d at 286 (citation omitted). However, a reviewing court may not conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (citation omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *Ulman*, 693 F.3d at 714; *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011); *Longworth*, 402 F.3d at 595 (citations omitted).

Knox raises three inter-related arguments concerning the ALJ's decision. First, Knox argues that ALJ Paris erred by adopting the RFC from the prior 2013 decision despite alleged changes in Knox's condition since that time. [R. 9-1 at 9-11.] Knox also contends that the ALJ failed to give adequate reasons for discounting her treating physician's RFC opinion. [*Id*. at 13-14.] Finally, Knox argues the ALJ erred by relying on opinions from state agency sources who did not have the opportunity to review her complete file. [*Id*. at 11-13.]

## A

Knox's motion for summary judgment first contends that ALJ Paris erred in adopting ALJ Holsclaw's previous RFC determination. [R. 9-1 at 9-11.] As an initial matter, because the decision which Knox challenges occurred subsequent to a previous denial of her claim, ALJ Paris was required to apply the principles explained by the Sixth Circuit in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840-43 (6th Cir. 1997). [Tr. 44.] The *Drummond* case requires that when an ALJ makes a final determination on a disability claim, subsequent ALJs are bound by the prior determination unless there is a showing of "new and material evidence," or a change in the applicable law or regulations. *Drummond,* 126 F.3d 842 ("Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.") The agency has further acquiesced in the Sixth Circuit's ruling in *Drummond* by restating its precise holding as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

6

AR 98-4(6), 1998 WL 283902, *3 (S.S.A. June 1, 1998).[2] Thus, a prior ALJ's finding concerning a claimant's RFC has a preclusive effect on future administrative proceedings if no new and material evidence is presented showing that the claimant's condition has significantly changed. *See, e.g., Blevins v. Astrue*, 2012 WL 3149343, *3 (E.D. Ky. July 31, 2012) (quoting *Drummond*, 126 F.3d at 843). To show such changed circumstances, "a comparison between circumstances existing at the time of the prior decision and circumstances existing at the time of the review is necessary." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007) (citing *Drummond*, 126 F.3d at 842). In the absence of "changed circumstances," the prior ALJ's findings are binding on any subsequent claim. *Id*.

Here, ALJ Paris correctly applied the *Drummond* standard, noting that "after review of the medical evidence, the undersigned finds that the claimant's impairments largely affect her as they did at the time of the previous decision," and he therefore "largely adopt[ed]" the previous RFC. [Tr. 44.] Although Knox frames her motion for summary judgment as one covering the entire period of her alleged disability, she is not entitled to a second bite at the apple for a period that has already been adjudicated. *See Drummond*, 126 F.3d at 841 ("Decisions made by the Administration cannot be repeatedly reconsidered."). Therefore, the Court must review the 2014 decision with this standard in mind and only consider evidence in the record since the time of the prior 2013 decision. The only such evidence which Knox relies upon are additional treatment records for neck and back pain from the Ballard Wright Clinic in April and May of 2014, and records from mental health treatment that she obtained at Comprehend, Inc.[3] [*See* R. 9-1 at 10-

---

[2] *Drummond* related to whether a prior finding must be accorded *res judicata* effect to bind the Commissioner in a subsequent claim. *Drummond,* 126 F.3d at 842. The principles of *res judicata* apply equally *against social security claimants* in the context of a prior denial of benefits, which is the circumstance here. *See Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1232–33 (6th Cir1993); *Cottrell v. Sullivan,* 987 F.2d 342, 344 (6th Cir.1992).

[3] To be precise, Knox does not definitively cite to any particular records in the argument portion of her brief, but only makes broad, general references to treatment received.

11.] Without pointing to any specific evidence, Knox generally asserts that this additional treatment, which included receiving injections for pain, was not considered by ALJ Paris. [*Id.*]

First, contrary to Knox's assertion, these changes in treatment do not constitute "new and material evidence to warrant departure from the previous RFC. For instance, the Ballard Wright records reflect that Knox was treated for chronic pain in her back, shoulder, and sacroiliac joints by Dr. Dennis Northrip, a pain specialist to whom she was referred by her primary care physician. [Tr. 556-79.] The record reflects that after an initial visit in April 2014, Dr. Northrip prescribed several pain medications, and Knox also received lumbosacral facet injections and bilateral sacroiliac joint injections with fluoroscopy in May, June, and October, 2014. [Tr. 567, 569, 646.] The notes from her visits with Dr. Northrip consistently record diagnoses of lumbosacral spondylosis without myelopathy, cervical disc degeneration, and chronic pain in her spine. [Tr. 567, 569, 577, 640.] These notes also consistently record that Knox exhibited normal neurologic functions and reflexes, had no cardiovascular or respiratory problems, had some numbness in her left fingers, and had a restricted range of motion in her lumbar and cervical spine and left shoulder due to pain. [Tr. 561-62, 576-77, 639-40.] These findings are consistent with ALJ Holsclaw's and ALJ Paris' determination that Knox's degenerative disc disease and cervical disc disease are severe. The physical restrictions in her RFC account for her restricted range of motion and difficulty with other physical activities. Importantly, these records do not indicate any worsening in Knox's condition from her prior medical records, but instead show that she was treated for essentially the same kind of pain and conditions as she had before.

As for her mental health treatment records, Knox merely states that since the time of the prior decision she has been receiving consistent treatment and has been prescribed medication.[4]

---

[4] This is presumably in response to ALJ Holsclaw's comment that the record in 2013 did not adequately document any ongoing mental health treatment.

[R. 9-1 at 11.] This general assertion alone, however, does not meet the standard for demonstrating changed circumstances described above. The records of Knox's mental health treatment indicate that providers at Comprehend, Inc. frequently noted her mood was anxious or "depressed" and at one point diagnosed her with PTSD and depressive disorder. [Tr. 598, 610, 611, 620-37.] Occasionally, however, her mood was described as "cheerful" [Tr. 624, 634], and the treatment notes consistently describe Knox as having a cooperative attitude, normal speech and orientation, adequate ability in abstract thinking, no perceptual disorders, average intellectual functioning, and no suicidal ideation. [Tr. 598-608.] Although one early mental status assessment revealed "mildly impaired" concentration and social judgment [Tr. 601], subsequent assessments described Knox' concentration, insight, awareness, and social judgement as "adequate" with no memory impairment. [Tr. 608.] One record Knox repeatedly emphasizes includes a notation that Knox once admitted to superficially cutting her left forearm with a razor soon after her boyfriend left her, but she denied any thoughts of suicide, saying she did it to "release stress." [Tr. 603, 608.] The records also reflect that at least on one occasion Knox was found to be noncompliant in taking her medication as prescribed [Tr. 604], but that her condition improved when she took her medication properly. [Tr. 544, 555.] Notably, Knox's records of mental health treatment from 2014 do not show any significant limitations in her attention, memory, or thought processes, nor do they contain any other specific limitations not accounted for in the RFC. [Tr. 595-637.]

Second, although Knox claims her injection regimen and her recent psychological treatment were both ignored, this assertion is without merit. ALJ Paris specifically considered both these aspects of Knox's treatment. For instance, the ALJ discussed the injection treatments Knox received at Ballard Wright when he evaluated her complaints of pain [Tr. 49], but noted

9

that before the first injection in May 2014, Knox had not had any medication "for some 12 months." [Tr. 50.]  ALJ Paris also considered that no provider had recommended Knox consider surgery either before or after she received the injections.  *See, e.g., Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012) (noting that a lack of surgery "is a legitimate consideration for the ALJ's analysis" when determining the severity of alleged impairments).  Although Knox claims ALJ Paris "failed to mention" the Clinic's diagnosis of low back and neck pain and lumbar spondylosis [R. 9-1 at 13-14], the ALJ's opinion is replete with references to Knox's back pain, along with recognition that her later records do not indicate her pain was significantly different in 2014.[5]  [*See* Tr. 48-51.]  Although Knox asserts that receiving injections constitutes "new material evidence," she does not explain how the injections demonstrate her pain has become worse or show that her RFC was not properly determined.  Therefore, the ALJ reasonably concluded that "the claimant's degenerative disc disease does not limit her more than set forth in the residual functional capacity."  [Tr. 50.]

Similarly, ALJ Paris specifically considered Knox's psychological treatment records, acknowledging that she had "difficulty due to childhood abuse and grief over her parents' deaths."  [Tr. 49.]  However, he further noted that Knox's symptoms of depression and anxiety were adequately treated with medication, and that her condition even improved when she consistently took her medication as prescribed.  [Tr. 51.]  Therefore, the ALJ concluded that Knox's "mental health symptoms do not limit her more than set forth in the RFC."  [*Id*.]

Because ALJ Paris clearly considered the post-2013 evidence but determined that it did not adequately support Knox's subjective complaints, it appears that Knox's contention concerning new evidence is more appropriately construed as disagreement with the ALJ's

---

[5] Moreover, pain alone is not a medically determined impairment but rather a symptom of an impairment.  *See* 20 C.F.R. § 404.1529.

10

assessment of her credibility. Under the regulations, the ALJ is charged with the responsibility of making credibility determinations when weighing the testimony of the claimant and any other sources. *Jones*, 336 F.3d at 475-76 (citation omitted). The ALJ's findings regarding credibility "are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *see also Casey*, 987 F.2d at 1234 (finding that ALJ's conclusions regarding credibility "should not be discarded lightly and should be accorded deference").

      Here, ALJ Paris noted that several aspects of the "new" records submitted led him to give less weight to Knox's assertions concerning her physical and mental limitations. For instance, ALJ Paris noted that Knox worked full-time at a factory through most of 2013 and stopped working because she was laid off rather than because of her allegedly disabling symptoms. [Tr. 50, 51.] *See, e.g., Workman v. Comm'r of Soc. Sec*., 105 F. App'x 794, 801 (6th Cir. 2004) (affirming ALJ's determination that claimant's testimony was not entirely credible partly because claimant's alleged disability onset date was the date his previous employer laid him off due to economic reasons). He also noted that the records at issue revealed Knox had been illegally using marijuana, and that she had a sporadic history of taking pain medication. [Tr. 50.] Knox's April 2014 records indicate she had not had pain medication for 12 months, while her July 2014 KASPER report was "inappropriate," showing she had at times filled prescriptions early and taken medication other than as prescribed. [Tr. 50, 577.] Knox stopped taking medication for her mental health conditions in January and June 2014, but in August and September 2014 she reported that her condition had greatly improved and her mood had stabilized when she took her medication properly. [Tr. 51.] Because such explanations are

appropriate, reasonable, and supported by substantial evidence, the Court must uphold the ALJ's credibility determination. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007).

In sum, the regulations define a person's RFC as being "the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments."). Here, ALJ Paris agreed that Knox suffered from severe impairments such as degenerative disc disease, affective disorder and anxiety, and he acknowledged that these impairments resulted in some limitations. [Tr. 47.] He simply disagreed with Knox about the extent of those limitations, and did not find any new and material evidence warranting departure from the previous RFC.[6] Although Knox may wish the ALJ had weighed her treatment records differently, it is not the Court's prerogative to resolve conflicts in the evidence or to second-guess the ALJ's carefully considered credibility determinations. *See Ulman*, 693 F.3d at 713; *Bradley*, 862 F.2d at 1228.

**B**

Knox also contends that ALJ Paris improperly discounted the opinion of her treating physician, Dr. Samuel Gehring, and that he did not adequately explain his reasons for doing so. A treating source's opinion on the issues of the nature and severity of a claimant's impairments is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993) ("This

---

[6] Moreover, the Court notes that ALJ Paris did include some minor changes to the RFC, such as reducing the amount of time Knox could stand or walk at a time from 30 minutes to 20 minutes, and changing "unlimited" pushing/pulling to "limited pushing/pulling," thus indicating that he did not simply accept the previous RFC verbatim without considering whether anything had changed. [Tr. 48-49.]

12

court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.")  The ALJ must explain what weight the treating physician's opinion warrants, and must give "good reasons" for not giving it controlling weight. *See* 20 C.F.R. § 404.1527(c)(2).  In doing so, the ALJ should consider factors such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Wilson*, 378 F.3d at 544); 20 C.F.R. §§ 404.1527(c), 416.927(c).  In considering these factors, however, the regulations do not require "an exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011).

      Here, in considering Dr. Gehring's opinion, ALJ Paris was particularly required to note any new evidence since the denial of Knox's previous application in 2013.  *See Drummond*, 126 F.3d at 842.  Although Dr. Gehring examined Knox several times after the denial of her previous DIB claim, the only opinion Knox argues that ALJ Paris discounted is a one-page medical statement from September 2014 concerning certain limitations in Knox's activities.  [Tr. 594.]  There, Dr. Gehring checked a series of boxes indicating his opinion that Knox could stand, walk, or sit less than 2 hours a day; could lift nothing at all; could "never" use her right or left hand in a repetitive action; that she could "[n]ever" bend, stoop, balance, climb a ladder, or climb stairs; and that she would be absent from work more than four days a month.  [Tr. 594.]  ALJ Paris specifically addressed this assessment, but explained that he gave it "little weight" because it was "inconsistent with the objective medical evidence which reveals generally mild findings or imaging of her spine, no need for surgical intervention since 2002, no significant treatment for

chronic obstructive pulmonary disease or her cardiac condition since the previous decision, and that the claimant's mental health condition has improved with proper medication." [Tr. 51.]

This explanation takes into account the factors the ALJ was required to consider, and it is supported by the evidence in the record, as noted elsewhere in the ALJ's opinion and in the other medical records submitted by Knox. In particular, the opinion in question consisted of checking boxes on a single page with no further explanation or support, and no corroboration by clinical or laboratory diagnostic techniques required to give the opinion controlling weight. *Wilson*, 378 F.3d at 544. In evaluating such opinions, "the ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773 (internal quotation omitted).

Additionally, as the ALJ noted, many of the limitations on this page were inconsistent with the record. [*See* Tr. 512-18.] In particular, the listed limitations are contradicted by records from other treating sources at Ballard Wright, and even by Dr. Gehring's own treatment records from earlier that same year, which indicated that Knox frequently had normal neurological examinations, normal reflexes and strength, and did not rely on a cane or other assistive device when walking. [Tr. 513, 561, 587, 591.] Dr. Gehring also confirmed on at least one occasion in 2014 that Knox had not been taking pain medication as prescribed – a fact the ALJ also reasonably took into account when evaluating the seriousness of her symptoms. [Tr. 512.] Thus, ALJ Paris did not ignore Dr. Gehring's opinion, but considered it within the context of his and other treating source opinions. Moreover, the ALJ appropriately incorporated the limitations that were supported by other evidence in the record, such as restricting Knox from climbing ladders or ropes, and from no more than occasionally balancing, stooping, and lifting. [Tr. 48-49.]

Ultimately, it is the ALJ's responsibility to weigh the evidence in the record. *Ulman*, 693 F.3d at 714; *see also Bradley,* 862 F.2d at 1227; *Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("The trier of fact has the duty to resolve" conflicting medical evidence). In doing so, the ALJ is required to incorporate into the RFC only those limitations he accepts as credible. *Casey*, 987 F.2d at 1235; 20 C.F.R. § 416.929(c)(4). Here, the record contains substantial evidence contradicting Dr. Gehring's one-time opinion about Knox's limitations and therefore supporting the ALJ's decision to give that particular opinion less weight. *See Cole*, 661 F.3d at 937 (noting the treating physician's opinion may be given less weight as long as ALJ explains his reasons such as inconsistency with the record and lack of corroborating evidence); *Price v. Comm'r Soc. Sec.*, 342 F. App'x 172, 175-76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.").

## C

The *Drummond* rule discussed above also applies to Knox's final argument. Knox argues that the ALJ erred in relying on opinions of state agency consultants who did not have the opportunity to review Knox's file in its entirety. [R. 9-1 at 11-13.] State agency sources are regarded "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96-6p, 1996 WL 374180, *2. While more weight is generally given to the opinions of treating physicians than to those of non-examining medical sources, *see* 20 C.F.R. §§ 404.1527(c)(1), 416.927, "the opinions of non-examining state agency medical consultants have some value, and under certain circumstances can be given significant weight." *Branch v. Astrue*, 2010 WL 5116948, at *5 (N.D. Ohio Dec. 9, 2010). Thus, the opinions of one-time examining professionals, state agency

doctors, and non-examining consultative professionals should be considered, and may be given significant weight depending on the analysis of the same factors as those considered for treating physicians, such as supportability, consistency and specialization. 20 C.F.R. § 404.1527(e), (f); § 416.927(e); *see also* SSR 96-6p at *2-*3; *Branch*, 2010 WL 5116948, at *5. Indeed, the regulations instruct the ALJ to consider the opinions of state agency consultants and to explain the reasons for the weight given them. 20 C.F.R. § 404.1527(e)(2)(i)-(ii), (f)(2); § 416.927(e); SSR 96-8p, 1996 WL 374184, *7 ("[t]he RFC assessment must always consider and address medical source opinions").

     Here, Knox contends that because the state agency consultants were not able to consider certain treatment records, and because one physical examiner did not mention the injections Knox received, the non-treating source opinions should not have been given substantial weight. [R. 9-1 at 11-13.] First, as a point of clarification, ALJ Paris did not mention any state agency sources by name, nor did he place particular emphasis on any of their opinions. More precisely, when summarizing a list of several reasons for his RFC determination, the ALJ stated that he gave "great weight" to "the state agency consultants' assessments" because "they are consistent with the objective medical evidence." [Tr. 51.] Therefore, Knox's implication that ALJ Paris' opinion was mostly based on these non-treating sources is inaccurate. Knox, however, assumes that the ALJ's general statement refers to Dr. Perritt, a non-examiner who issued her opinion on June 26, 2014 [Tr. 126-51]; Dr. Thompson, a non-examiner who issued her assessment on August 6, 2014 [Tr. 155-81]; and physical examiner Dr. Irlandez, who gave his opinion on August 21, 2014 [Tr. 163-82]. Given the dates of their opinions, these examiners were unable to consider treatment records dating from after July or August 2014, and Knox therefore contends that ALJ Paris should not have relied on their opinions.

Once again, as with Knox's other arguments, the *Drummond* rule directs that the proper inquiry is whether new and material evidence demonstrates Knox's circumstances have significantly changed since December 2013. The only records that Knox argues would have contradicted the state agency assessments are the following: the mental health record noting she had cut herself with a razor, a low GAF score from one of her visits to Comprehend, Inc., the injections she received for neck and back pain, and the one-page RFC assessment by Dr. Gehring discussed above. [R. 9-1 at 11-12.] ALJ Paris, however, discussed each of these records in his own opinion, and the assessments of the agency consultants were only one of many factors listed in support of his RFC determination.[7] Because none of these records constitute new and material evidence in light of the *Drummond* standard, however, Knox's criticism that the agency sources were unable to consider them is unmerited.

For instance, the mental health records created after the agency sources issued their opinions do not reveal significant limitations unaccounted for by the RFC. The providers at Comprehend, Inc. did not believe the incident of cutting herself with the razor revealed Knox had suicidal tendencies or other serious mental issues apart from general depression and anxiety which were well-controlled with proper medication.[8] As discussed above, Knox's injection regimen by itself does not indicate that the limitations in the RFC should be more restrictive, and Dr. Gehring's RFC assessment was contradicted by other evidence in the record. As for Knox's GAF scores from Comprehend, Inc., the ALJ properly explained that he gave them "little weight" because their range varied so widely – from 29 to 74 within one year. [Tr. 51.] This was

---

[7] The notion that ALJ Paris wholly, or even mostly, relied on the agency source opinions is also belied by his determination that Knox could perform no past relevant work, despite the opinion of Dr. Perritt that Knox could perform past work as an operator [Tr. 137, 150], and the opinions of Dr. Thompson and Dr. Irlandez that she could work as a data entry clerk. [Tr. 166, 181.]

[8] Also, the record referring to this incident is dated December 19, 2013, and therefore, contrary to Knox's assertion, was included in the records reviewed by the agency consultants. [Tr. 603.]

a reasonable determination since a GAF score represents a particular mental health professional's subjective opinion and by itself is not an adequate basis for a decision to award or deny benefits. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *see also DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 416 (6th Cir. 2006) ("Any failure to reference Global Assessment Functioning scores or to compare different scores attributed to the same subject, without more, does not require reversal."). Thus, the ALJ did not err in the weight given to the agency consultants' opinions because even if the consultants had considered these particular records, the outcome would have been the same.

Moreover, ALJ Paris adequately explained his reasons for giving these opinions "great weight." In general, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Additionally, greater weight is assigned to opinions that are "more consistent ... with the record as a whole." §§ 404.1527(c)(4), 416.927(c)(4). As noted above, Dr. Gehring's one-page RFC assessment was inconsistent with other evidence in the record and was unaccompanied by any explanation for the reasoning behind his conclusions. In contrast, the agency consultants considered all of Knox's treatment records up through the time of their respective opinions, specifically examining whether those records contradicted the previous RFC determination, as required by the *Drummond* rule. [Tr. 127-29, 140-41, 156-58, 171-73.] The agency assessments referenced multiple documents as supporting evidence, discussed records from treating sources, and provided conclusions that were consistent with the record. Therefore, the ALJ did not err in the weight he gave to the

opinions of agency consultants, or in the reasons he gave for doing so. *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438-40 (6th Cir. 2012) (upholding ALJ's decision to give greater weight to non-examining state agency sources where ALJ explained that their opinions were consistent with the longitudinal treatment record).

### III

In conclusion, as long as substantial evidence exists to support the ALJ's determination, this Court must affirm that decision. *Ulman*, 693 F.3d at 714; *Bass*, 499 F.3d at 509. As explained above, the records which Knox relies upon simply do not constitute new and material evidence demonstrating that her circumstances have changed such that the RFC should include additional restrictions, and therefore both ALJ Paris, and this Court, are bound by the previous precedent under *Drummond*. Accordingly, it is hereby **ORDERED** as follows:

1. Knox's Motion for Summary Judgment [**R. 9**] is **DENIED**;

2. The Commissioner's Motion for Summary Judgment [**R. 10**] is **GRANTED**; and

3. Judgment in favor of Defendant will be entered contemporaneously herewith.

This the 17th day of August, 2016.

Gregory F. Van Tatenhove
United States District Judge